UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **FINANCIAL FEDERAL CREDIT INC,** | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | **CIVIL ACTION NO. H-05-00313** |
| | § | |
| **ALDO R DINARDO,** *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff's Motion for Summary Judgment (Doc. # 10). For the following reasons, Plaintiff's motion is **GRANTED**.

## I. BACKGROUND

This case concerns deficiencies that Defendants allegedly owe to Plaintiff under leases for cement trucks and equipment, following Plaintiff's public sale of the leased equipment. On June 13, 2003, Plaintiff Financial Federal Credit, Inc. ("FFCI") and Defendant Aldo Dinardo ("Mr. Dinardo") entered into a lease agreement, under which FFCI agreed to lease certain equipment to Mr. Dinardo in exchange for rental payments totaling $178,675.00. Pl.'s Mot. for Summ. J., Ex. A. Mr. Dinardo leased the equipment for use by his concrete company, Champion Ready Mix, in Las Vegas, Nevada. On July 25, 2003, FFCI and Mr. Dinardo entered into a second lease agreement, under which FFCI agreed to lease additional equipment to Mr. Dinardo in exchange for rental payments totaling $72,240.00. Pl.'s Mot. for Summ. J., Ex. F. As part of both leases, Mr. Dinardo granted FFCI a security interest in the leased equipment. As additional security for the first lease, Mr. Dinardo executed and delivered to FFCI a security agreement dated June 13, 2003, giving FFCI a security interest in the equipment described on an attached schedule. Pl.'s Mot. for Summ. J., Ex. E.

Both leases provide that all indebtedness due under the lease terms will be accelerated in the event of default by Mr. Dinardo, and that Mr. Dinardo is liable for accrued interest, expenses, and reasonable attorneys' fees incurred by FFCI in enforcing the leases. The security agreement similarly provides for the acceleration of Mr. Dinardo's obligations in the event of default, as well as for accrued interest, expenses, and reasonable attorneys' fees. Both leases and the security agreement contain choice of law provisions, indicating that the contracts are governed by the laws of the state of the debtor's location set forth in the contracts. All three agreements set forth the address of Mr. Dinardo, doing business as Champion Ready Mix, as P.O. Box 36196, Las Vegas, Nevada 89133.

In June 2003, Defendant Helga Dinardo ("Mrs. Dinardo") executed and delivered to FFCI a continuing guaranty, as "material inducement" for FFCI to enter into the aforementioned leases with Mr. Dinardo.[1]  Pl.'s Mot. for Summ. J., Ex. I. The guaranty provides that Mrs. Dinardo is directly and unconditionally liable to FFCI for the payment and performance of all of Mr. Dinardo's obligations to FFCI, including interest. The guaranty also provides that Mrs. Dinardo is liable for expenses and reasonable attorneys' fees incurred by FFCI in enforcing the guaranty. The address listed for Mrs. Dinardo in the guaranty is the Dinardos' home address, at 1436 Kensington Drive, Fullerton, California 92831.

The parties agree that Mr. Dinardo defaulted under the terms of the leases by failing to make monthly rental payments. Thereafter, FFCI took possession of the leased equipment and made plans to dispose of the equipment at a public sale. Rodney Sepulvado, Vice President and Branch Manager of the Houston, Texas FFCI office, has testified by affidavit that FFCI mailed notices of the sale to Mr. and Mrs. Dinardo on October 26, 2004, both by certified mail, return

---

[1] The guaranty is dated June 13, 2003, although the date appearing alongside Mrs. Dinardo's signature is June 15, 2003. This is not an important distinction, however, as Defendants do not dispute that the guaranty formed part of the consideration for the leases, or that the obligations of the guaranty are valid and binding.

receipt requested, and by first class mail, postage prepaid. Sepulvado Aff. ¶ 22. FFCI mailed notices to Mr. Dinardo at an address in Logandale, Nevada and at two addresses in Las Vegas, Nevada, including P.O. Box 36196, Las Vegas, Nevada, 89133. *Id.* ¶¶ 23-25. FFCI also mailed a notice to Mrs. Dinardo at the Dinardos' home, at 1436 Kensington Drive, Fullerton, California 92831. *Id.* ¶ 26. Additionally, FFCI published notice of the sale in *The Contractor's Hotline* on October 29, 2004, and in *The Las Vegas Review-Journal/Sun* on November 6 and 7, 2004. *Id.* ¶ 27. Mr. Sepulvado testified that in November 2004, prior to the sale, Mr. Dinardo called him and spoke to him about the equipment and the public sale. *Id.* ¶ 3. Mr. Dinardo has testified by affidavit that he received no prior notice of the sale. Dinardo Aff. ¶ 5.

FFCI sold the leased equipment at a public sale on November 9, 2004, at 10:00 a.m., at an accessible location in Las Vegas, Nevada. Sepulvado Aff. ¶ 29. FFCI made the equipment available for inspection for several days prior to this date, and conducted the sale as a public sale, providing time for attendees to bid on the equipment and selling the equipment one item at a time. *Id.* ¶¶ 29-30. Mr. Sepulvado testified that, based on his experience conducting and attending public sales of commercial equipment, FFCI's sale of the leased equipment was in accordance with industry standards and commercially reasonable. *Id.* ¶ 32. FFCI sold the equipment for an aggregate amount of $140,000.00, which Mr. Sepulvado testified was the reasonable market value of the equipment. *Id.* ¶ 28. John Gabriello, owner of the company that repossessed the leased equipment for FFCI, has testified that the leased equipment was in "very poor condition," and that in his thirty-five years of experience in the heavy equipment industry, he had "rarely seen equipment in such a state of misuse and neglect." Gabriello Aff. ¶¶ 3-4. Gabriello noted many specific problems with the equipment, including damage to the boom of the crane, damage to the jib, inoperable hydraulics, unusable tires, inoperable or non-existent

windows, problems with the engine and engine compartment, eight inches of concrete dust covering the entire crane, two mixer trucks completely full of dried concrete, one mixer truck half full of concrete, and two mixer trucks that did not run.  *Id.*  FFCI incurred expenses of $10,922.98 in advertising, preparing for, and conducting the sale.  Sepulvado Aff. ¶ 31.

Mr. Dinardo has testified that, prior to the sale of the leased equipment, there was a severe shortage of dry cement in Las Vegas, and many of the area's concrete mixing companies, including his own, had failed.  Dinardo Aff. ¶ 3.  At the time of the sale, Mr. Dinardo testified that there was "virtually no realistic market for equipment used in the concrete business and everyone in the industry was well aware of that fact."  *Id.* ¶ 6.  Mr. Dinardo alleges that FFCI should have moved some of the equipment, including the mixing trucks, crane, and crane carrier, to another area where the market would have been better.  *Id.* ¶ 7.  Mr. Dinardo has also testified that when he last saw the crane, there was nothing wrong with its boom, and that no damage to the boom was ever reported to him.  *Id.* ¶ 9.  Mr. Dinardo points out that MAL Equipment Company offers a crane similar to the one sold by FFCI, for a sale price of $229,000.  *Id.* ¶ 8.

FFCI moved for summary judgment, seeking the difference between the proceeds of the public sale and the remaining rent due under the leases, in addition to interest, attorneys' fees, and costs.  In response, the Dinardos argue that they were not sufficiently notified of the sale, that the location of the sale and the price for which the equipment was sold were not commercially reasonable, and that the expenses FFCI incurred in conducting the sale were not reasonable.  Having considered the parties briefings, and the parties' having appeared for a hearing, the Court concludes that there are no genuine issues of material fact and that summary judgment should be granted for FFCI.

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law, based on the evidence thus far presented. *See* Fed. R. Civ. P. 56(c). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material facts exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.*

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If FFCI shows that there is a lack of evidence to support the Dinardos' claims, the Dinardos "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Kee*, 247 F.3d at 210 (quotation omitted). The Dinardos cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

### B. Choice of Law

The leases entered into by FFCI and Mr. Dinardo include identical choice of law clauses, which state that that "the validity and enforceability of [the] lease[s] and each of [their] terms

shall be governed by the laws of the state of lessee's location as set forth in [the] lease[s]." Pl.'s Mot. for Summ. J., Exs. A, F ¶ 15. The security agreement executed by Mr. Dinardo similarly provides that it shall be governed by "the laws of the state of debtor's location as set forth in this agreement." Pl.'s Mot. for Summ. J., Ex. E ¶ 12. Both leases and the security agreement set forth Mr. Dinardo's address as P.O. Box 36196, Las Vegas Nevada, 89133. Pl.'s Mot. for Summ. J., Exs. A, E, F. Accordingly, the lease and security agreement provisions, as well as the parties' rights and obligations under these contracts, are governed by Nevada law.

Despite the parties' contractual choice of law, FFCI appears to assume that Texas law applies to the leases, and the Dinardos have not argued otherwise. With respect to the reasonableness of the sale, the choice between Nevada and Texas law is of little consequence, as both the relevant Nevada and Texas statutes mirror the Uniform Commercial Code, and Nevada and Texas courts have interpreted these provisions in a similar fashion. With respect to the rate of pre-judgment interest to be applied to the amounts owed by the Dinardos, however, the laws of Nevada and Texas differ, and the choice of law will affect the amount of interest to which FFCI is entitled. Although FFCI has claimed interest at the maximum rate allowed by Texas law, the Court is bound by the terms of the contracts and the choice of law provisions contained therein. When the choice of law affects the relief to which FFCI is entitled, as it does in the case of pre-judgment interest, therefore, the Court will apply Nevada law.

**C. Reasonableness of the Sale**

Upon a debtor's default, a secured party may sell any collateral in its present condition, provided that "[e]very aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable." NEV. REV. STAT. §104.9610(2); *accord* TEX. BUS. & COM. CODE § 9.610(b). A seller disposing of collateral must ensure both

6

that the disposition is commercially reasonable, and that the seller gives the debtor proper notice of the disposition. *Levers v. Rio King Land & Inv. Co.*, 560 P.2d 917, 919-20 (Nev. 1977); *Fed. Deposit Ins. Corp. v. Lanier*, 926 F.2d 462, 464 (5th Cir. 1991). Here, the Dinardos argue that FFCI did not properly notify them of the sale, that the location of the sale and the price for which the equipment was sold were unreasonable, and that the expenses incurred in conducting the sale were unreasonable. Because FFCI has shown that all aspects of its sale were reasonable, and because the Dinardos have failed to present facts sufficient to support any of its claims to the contrary, a summary judgment that the public sale was commercially reasonable is proper.

*1. Notice*

The leases entered into by FFCI and Mr. Dinardo specify what actions will constitute adequate notice of a sale of the leased equipment. The leases provide that:

> Lessee agrees that any public or private sale shall be deemed commercially reasonable (i) if notice of any such sale is mailed to Lessee (at the address for Lessee specified in this Lease or in any other agreement now or hereinafter held by Lessor) at least 10 days prior to the date of any public sale or after which any private sale will occur (ii) if notice of any public sale is published in a newspaper of general circulation in the county where the sale will occur at least once within the 10 days prior to the sale. . . .

Pl.'s Mot. for Summ. J., Exs. A, F ¶ 14. The security agreement, which Mr. Dinardo executed as additional security for the first lease, contains identical notice requirements. Pl.'s Mot. for Summ. J., Ex. E ¶ 8.

Additionally, the applicable statutes provide that "a secured party that disposes of collateral . . . shall send to [the debtor] a reasonable authenticated notification of disposition." NEV. REV. STAT. § 104.9611 (2), (3); TEX. BUS. & COM. CODE § 9.611(b), (c). Notably, while these provisions require that reasonable notification be *sent*, they do not require that the notification actually be *received*. The general definitions for the provisions make clear that:

7

> "Send" in connection with a writing, record or notice means:
> (1) To deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and, in the case of an instrument, to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances; or
> (2) In any other way cause to be received any record or notice within the time it would have arrived if properly sent.

NEV. REV. STAT. § 104.1201(jj); *accord* TEX. BUS. & COM. CODE § 1.201(36).  Thus, while a party *may* prove that it sent reasonable notice by showing that the notice was received, it is not *necessary* to show actual receipt where the notice was properly addressed and deposited in the mail.  Rather, the notice requirement means only that the creditor must make reasonable efforts to notify the debtor before disposing of the collateral.  *Levers*, 560 P.2d at 919; *MBank Dallas N.A. v. Sunbelt Mfg., Inc.*, 710 S.W.2d 633, 635 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

Here, FFCI has proved that it met both its contractual and statutory notice obligations, and the Dinardos have failed to present any facts showing otherwise.  FFCI has demonstrated that it notified the Dinardos of the public sale of the leased equipment by correspondence dated October 26, 2004, more than ten days before FFCI conducted the sale on November 9, 2004.  Sepulvado Aff. ¶ 22; Pl.'s Mot. for Summ. J., Exs. J, K, L, M.  As required by the leases and the security agreement, FFCI mailed a notice to Mr. Dinardo at his specified address, P.O. Box 36196, Las Vegas, Nevada 89133, as well as at two other Las Vegas addresses.  Sepulvado Aff. ¶¶ 23-25; Pl.'s Mot. for Summ. J., Exs. J, K, L.  FFCI also mailed notice to Mrs. Dinardo at the home address provided in the guaranty, 1436 Kensington Drive, Fullerton, California 92831.  Sepulvado Aff. ¶ 26; Pl.'s Mot. for Summ. J, Ex. M.  FFCI properly addressed the notices and sent them by both first class mail with the postage prepaid, and by certified mail, return receipt requested.  Sepulvado Aff. ¶ 22; Pl.'s Mot. for Summ. J., Exs. J, K, L, M. While the certified notices sent to the three Nevada addresses were returned to the post office as unclaimed, FFCI

has shown that the U.S. Postal Service delivered the notice addressed to the Dinardos' home in Fullerton, California, on November 2, 2004.  Sepulvado Aff. ¶ 26; Pl.'s Mot. for Summ. J., Ex. M.  Additionally, FFCI published notice of the sale in *The Las Vegas Review-Journal/Sun*, a newspaper of general circulation within the Las Vegas area, on November 6 and 7, 2004.  Sepulvado Aff. ¶ 27; Pl.'s Mot. for Summ. J., Ex. N.  This publication was within the ten days prior to the sale on November 9, 2004.  FFCI has thus shown that it sent reasonable notification of the sale to the Dinardos' addresses, as required by statute and by the contracts, and that it published notification of the sale as required by the contracts.

In response, Mr. Dinardo has asserted that he "received no prior notice of the sale," which, viewing the facts in the light most favorable to the Dinardos, the Court assumes to be true.  Dinardo Aff. ¶ 5.  That Mr. Dinardo *received* no prior notice of the sale, however, does not mean that FFCI did not fulfill its duty to *send* reasonable notice to the Dinardos.  The Dinardos have not presented any evidence that FFCI did not actually mail notification letters as discussed above and pursuant to the terms of the contracts, or that these notices were unreasonable as to their content, their timeliness, or FFCI's manner of sending them.  The Dinardos have also not offered any evidence to contradict FFCI's showing that it published timely notice of the sale in local Las Vegas newspapers.   FFCI has shown that it fully complied with its statutory and contractual duties to send reasonable notice to the Dinardos prior to the public sale, and it is entitled to summary judgment on this point.

## 2. Location and Price

FFCI conducted the sale of the leased equipment at 5900 N. Shatz, Las Vegas, Nevada 89115.  Sepulvado Aff. ¶ 29.  The Dinardos do not challenge that the location of the sale was easily accessible, or that FFCI made the equipment available for inspection for several days prior

to the sale. *Id.* ¶ 30. Rather, the Dinardos assert that the market for cement equipment in Las Vegas was severely depressed at the time that the sale took place, and that FFCI could have obtained a more favorable price for the equipment by moving the sale to another location. Dinardo Aff. ¶ 7. The Dinardos contend that, because FFCI did not hold the sale in a more favorable location, the sale was not commercially reasonable. Assuming it to be true that the Las Vegas cement industry was depressed in late 2004, an assertion that the Dinardos have failed to support with any evidence apart from Mr. Dinardo's personal opinion, this is not enough to show that the sale was commercially unreasonable.

While a seller must strive to obtain a fair price for the goods sold at a public sale, there is no requirement that the seller must conduct the sale under the best possible conditions in order for the sale to be commercially reasonable:

> The fact that a greater amount could have been obtained by a collection, enforcement, disposition or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition or acceptance was made in a commercially reasonable manner.

NEV. REV. STAT. § 104.9627(1); *accord* TEX. BUS. & COM. CODE § 9.627(a). *See also Jones v. Bank of Nevada*, 535 P.2d 1279, 1281 (Nev. 1975) (price obtained upon sale is not determinative of commercial reasonableness); S*iboney Corp. v. Chicago Pneumatic Tool Co.*, 572 S.W.2d 4, 8 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.) ("The fact that a better price could have been obtained does not render the sale commercially unreasonable."). The Dinardos have failed to offer any authority for their assertion that FFCI had a duty to move the equipment and conduct the sale where market conditions were more favorable. Moreover, while Mr. Dinardo has testified that the cement industry in Las Vegas was depressed, the Dinardos have not offered any evidence showing how other markets were more favorable at the time of the sale. The

Dinardos have failed to present evidence sufficient to show that the location of the sale in Las Vegas was commercially unreasonable.

The Dinardos also assert that the sale price of the equipment was unreasonably low in light of the equipment's good condition. Mr. Dinardo testified that "[t]he last time [he] saw the crane there was nothing wrong with the boom and no damage to the boom was ever reported to [him]." Dinardo Aff. ¶ 9. However, Mr. Dinardo does not indicate when he last saw the crane. In light of his testimony that Andrew Seligman, Operational Supervisor of Champion Ready Mix, was responsible for the operations of the company, and that Mr. Dinardo was unaware of the company's situation until after the sale, it is extremely unlikely that Mr. Dinardo was familiar with the condition of the crane or other leased equipment at or near the time that FFCI repossessed it.[2] In the absence of any evidence as to when Mr. Dinardo saw the crane or to how he was able to ascertain that there was nothing wrong with the crane, Mr. Dinardo's testimony is insufficient to show that the leased equipment was in a condition that that should have yielded a higher price at a commercially reasonable sale.

Additionally, Mr. Dinardo references a 1978 Link Belt, Model HC218A crane that MAL Equipment Company ("MAL") was offering for sale on its website, at a price of $229,000. Dinardo Aff. ¶ 8. Mr. Dinardo has testified that, of the cranes listed on MAL's website, this crane was "the most like" the crane that FFCI had leased to him and sold at the public sale. The

---

[2] Mr. Dinardo states that:
> Andrew Seligman was the operational supervisor of Champion Ready mix and responsible for the day to day operations of the company. By the time I found out how badly the sever [sic] cement shortage had virtually destroyed the business of Champion Ready Mix it was too late to correct or do anything to change the course of the business. Seligman was supposed to make the lease payments to FFCI but he failed to do so and he failed to so inform me. Apparently notices from FFCI were sent to the address of Champion Ready Mix in Las Vegas but if received by Seligman they were not forwarded to me. Mr. Seligman has disappeared and I have no idea where he is or how to locate him.
> By the time I (and my wife) found out about the situation, the sale of all the collateral had already been performed.

Dinardo Aff. ¶¶ 4-5.

Dinardos contend that the fact that MAL was offering a crane for sale at $229,000 shows that FFCI's sale price of $140,000 for all of the leased equipment was unreasonable. This assertion is demonstrably false. While the Dinardos have offered only Mr. Dinardo's unsupported assertion that the MAL 1987 Link Belt crane was most like FFCI's crane, FFCI has pointed to specific and significant distinctions between the two cranes. Mark Lomas, an equipment broker who specializes in cranes and runs the MAL website, testified that he reviewed photographs of the crane that Mr. Dinardo had leased from FFCI and noted "major distinctions" between it and the MAL crane. Lomas Aff. ¶ 3. For example, Mr. Lomas noted that the MAL crane had an upgraded engine and various equipment that FFCI's crane did not have. *Id.* Additionally, the MAL crane was in ready-to-work and good cosmetic condition, while FFCI's crane was in poor cosmetic condition and did not appear ready to work. *Id.* Without any contrary evidence that the cranes were similar in features and condition, the fact that MAL was offering its crane for a higher price does not show that the price that FFCI obtained for the crane Mr. Dinardo had leased was commercially unreasonable.

Whereas the Dinardos have failed to present evidence showing that the price for which FFCI sold the leased equipment was unreasonably low, FFCI has presented ample evidence that there were problems with the equipment that made the sale price obtained reasonable. John Gabriello, the owner of the company that repossessed the leased equipment on FFCI's behalf, testified to the extensive damage to the equipment. Gabriello Aff. ¶ 3. Mr. Gabriello testified that he became "personally familiar" with the equipment, when his company repossessed the equipment in September 2004. *Id.* ¶ 2. Among the many problems that Gabriello noticed were damage to the boom of the crane, damage to the jib, inoperable hydraulics, unusable tires, inoperable or non-existent windows, problems with the engine and engine compartment, eight

12

inches of concrete dust covering the entire crane, and cement filling two mixer trucks completely and one mixer truck halfway. *Id.* ¶ 3. Two mixer trucks also did not run. *Id.*

In light of this evidence, and in light of the Dinardos' failure to present competent evidence showing that the location of the sale or the price obtained for the equipment were unreasonable, a summary judgment that FFCI's sale of the Dinardos' leased equipment was commercially reasonable is appropriate.

*3. Expenses*

FFCI asserts in its summary judgment motion that it is entitled to recover from the Dinardos the expenses that it incurred in preparing for and conducting the sale of the leased equipment, which amounted to $10,922.98. Sepulvado Aff. ¶ 31. The leases and the security agreement entered into by FFCI and Mr. Dinardo provide that Mr. Dinardo is liable for all costs, expenses, and damages incurred by FFCI in conducting a sale, including "costs related to the repossession reconditioning and disposition of the [p]roperty and [a]dditional [c]ollateral and all incidental and consequential damages." Pl.'s Mot. for Summ. J., Exs. A, F ¶ 11; *accord* Pl.'s Mot. for Summ. J., Ex. E ¶ 8. FFCI indicated that it had incurred expenses for travel, a lien search, advertising, freight, storage, and repairs. Sepulvado Aff. ¶ 31. In response to FFCI's motion, the Dinardos claimed that these expenses were unreasonable. Specifically, the Dinardos argued that FFCI failed to provide any detail for its various categories of expenses, so that the reasonableness of each particular expense could be scrutinized. Dinardo Aff. ¶ 11. Subsequent to the Dinardos' response, FFCI submitted a reply and additional exhibits to the Court, documenting each expense it had incurred in preparing for the sale of the leased equipment.

First, FFCI has submitted an expense report and receipts for $781.98 in travel expenses, which include Mr. Sepulvado's flight from Houston to Las Vegas, his hotel in Las Vegas for two

13

nights, and other travel-related items. Pl.'s Reply, Ex. 1. FFCI has shown that, as the Vice President and Branch Manager of the FFCI Houston office, it was necessary and reasonable for Mr. Sepulvado to travel to Las Vegas to conduct the sale. Sepulvado Supp. Aff. ¶¶ 2-3. Next, FFCI has claimed $150.00 for the expense of a lien search, and $1,591.00 in advertising expenses, which it incurred by publishing notice of the sale in *The Las Vegas Review-Journal/Sun* and *The Contractor's Hotline*. Pl.'s Reply, Ex. 3. Finally, FFCI incurred $4,800 for freight, $2,000 for storage, and $1,600 for repairs to the leased equipment sold at the sale, as demonstrated by its detailed invoices from Trailwinds, NV. Pl.'s Reply, Ex. 2.

Although the Court, at a hearing on December 7, 2005, granted the Dinardos additional time to file a sur-reply to FFCI's reply, the Dinardos filed no additional briefings. The Dinardos have not contested the reasonableness of the particular types or amounts of the expenses that FFCI documented in its reply brief. Furthermore, FFCI has sufficiently proved that each of its claimed expenses was necessarily incurred in preparing for and conducting the sale, and that the expenses were commercially reasonable. A summary judgment to this effect is therefore proper.

**D Liability for Deficiency, Interest, and Attorneys' Fees**

Where a creditor has lawfully disposed of collateral and applied the proceeds to a debt owed, the debtor is liable for any deficiency. NEV. REV. STAT. § 104.9615 (4)(b); TEX. BUS. & COM. CODE § 9.615(d)(2). Here, both leases specifically provide that Mr. Dinardo is liable for "any deficiency due and owing to [FFCI] after any public or private sale." Pl.'s Mot. for Summ. J., Exs. A, F ¶ 11. Additionally, the leases provide that, after maturity of Mr. Dinardo's indebtedness under the leases, including acceleration of maturity, he is liable to FFCI for "interest on the entire unpaid obligation . . . at the maximum lawful daily rate not to exceed 0.0666% per day." Pl.'s Mot. for Summ. J., Exs. A, F ¶ 3. The leases also make Mr. Dinardo

liable for all expenses and reasonable attorneys' fees incurred by FFCI in enforcing the lease or its provisions.  Pl.'s Mot. for Summ. J., Exs. A, F ¶¶ 3, 11.  Similar provisions, holding Mr. Dinardo liable for interest at a maximum lawful daily rate not to exceed 0.0666% per day, and for FFCI's expenses and reasonable attorneys' fees, are found in the security agreement.  Pl.'s Mot. for Summ. J., Ex. E ¶¶ 6, 8.  As the guarantor of Mr. Dinardo's obligations to FFCI, Mrs. Dinardo is likewise liable for these amounts.  Pl.'s Mot. for Summ. J., Ex. I.

FFCI has shown that, after crediting the proceeds of the sale of the leased equipment to the amount owed by Mr. Dinardo under the leases, there remains a deficiency of $80,173.99 as of June 1, 2005.  Sepulvado Aff.  ¶ 36.  FFCI has also shown that it incurred attorneys' fees in the amount of $2,000.  Blair Bruce, Counsel for Plaintiff, Aff. ¶ 6.  Finally, FFCI asserts that it is entitled to pre-judgment interest at a rate of eighteen percent (18%) per annum, which is the highest rate allowed by Texas law.  As discussed previously, however, Nevada law governs the leases and security agreement, and accordingly, the rate of pre-judgment interest to be applied to amounts owed by the Dinardos.  Under Nevada law, "[p]arties may agree for the payment of any rate of interest on money due or to become due on any contract . . . ."  NEV. REV. STAT. § 99.050; *see also Consumers Distrib. Co. v. Hermann*, 812 P.2d 1274, 1278 (Nev. 1991) ("Nevada has no statute which precludes high interest rates.").  Thus, the rate of pre-judgment interest to be applied is the contractually agreed-upon rate of 0.0666% per day, or approximately 24% per annum.

While contending that they are not liable to FFCI for any deficiency because the sale was commercially unreasonable, the Dinardos have not contested the authenticity or reasonableness of FFCI's claimed amount of attorneys' fees.  The Dinardos have also not contested the application of pre-judgment interest to amounts owed.  FFCI has demonstrated that its public

15

sale of the leased equipment was commercially reasonable and lawful, and the Dinardos have failed to present facts sufficient to raise any genuine issue of material fact or support any of its claims to the contrary. Accordingly, FFCI is entitled to its requested summary judgment.

## III. CONCLUSION

Plaintiff's Motion for Summary Judgment is **GRANTED**, and **JUDGMENT IS ENTERED** for Plaintiff.

**IT IS SO ORDERED**.

**SIGNED** this 22nd day of March, 2006.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**